# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* APPLE COMPUTER, MODEL A1418, SILVER, SERIAL NO. C02NG9K4F8J2 CURRENTLY LOCATED AT 90 K STREET NE, WASHINGTON, DC  20002 | Case No.  22-SW-23 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 924(c) - Possessing Firearms During Drug Trafficking Crimes; 18 U.S.C. § 922(g) - Unlawful Possession of Firearms; 21 U.S.C. § 841(a) - Distribution and the Possession with the Intent to Distribute Controlled Substances. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Chris Ray, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone
_____ *(specify reliable electronic means)*.

Date:  _____2/7/2022_____          _____
*Judge's signature*

City and state:  _____Washington, D.C._____          _____
Robin M. Meriweather
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  22-SW-23 |
| APPLE COMPUTER, MODEL A1418, SILVER, SERIAL | ) | |
| NO. C02NG9K4F8J2 CURRENTLY LOCATED AT 90 K | ) | |
| STREET NE, WASHINGTON, DC  20002 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of Columbia _____ .
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 21, 2022 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 2/7/2022 _____          _____
                                                                                              *Judge's signature*

City and state: _____ Washington, D.C. _____          _____ Robin M. Meriweather _____
                                                                                              United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-SW-23 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
*Property to be searched*

The property to be searched is an Apple Computer, Model A1418, Silver in Color, Serial

No. C02NG9K4F8J2, which is currently located in the District of Columbia at the ATF

Washington Field Division located at 90 K Street NE, Washington, D.C.

1

## ATTACHMENT B

PROPERTY TO BE SEIZED

The items to be seized are all evidence, contraband, fruits of crime, or other items, used in the commission of a narcotics trafficking and firearms offenses in violation of 21 U.S.C. § 841(a)(1); 18 U.S.C. § 924(c); and 18 U.S.C. § 922, (collectively, the target offenses), including, but not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data:

(i)      establishing or documenting the commission of the target offenses, to include ledgers;

(ii)     identifying locations where the individual committed the target offenses, traveled to before and after the commission of the target offenses, and in preparation for the target offenses;

(iii)    reflecting the ownership and use of the items identified in Attachment A by the individual committing the target offenses;

(iv)     documenting meetings and communications between individuals committing one or more of the target offenses;

(v)      reflecting communications between the individual committing one or more of the target offenses and other individuals, discussing the commission of one or more of the target offenses;

(vi)     reflecting communications between the individual committing one or more of the target offenses and other individuals who may have assisted or provided support in the commission of one or more of the target offenses;

1

(vii)    containing photographs or video that would constitute evidence of a violation of the target offenses;

(viii)    documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics in violation of the target offenses; and

(ix)    documenting or containing evidence of the purchase of items from the assets derived from the commission of a narcotics trafficking offense in violation of the target offenses, which would constitute evidence of one of the target offenses.

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF:    \*       **No.  22-SW-23**
                                      \*

**APPLE COMPUTER, MODEL A1418,**      \*
**SILVER SERIAL NO. C02NG9K4F8J2**   \*       <u>**Under Seal**</u>
**CURRENTLY LOCATED AT**            \*
**90 K STREET NE, WASHINGTON, DC  20002** \*
                                        \*

<u>**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**</u>

    I, Christopher Ray, a Special Agent with the Federal Bureau of Investigation (FBI),

Washington Field Office, Washington, D.C., being duly sworn, depose and state as follows:

<u>**INTRODUCTION**</u>

    1.    I, also known as "your affiant," am an "investigative or law enforcement officer of

the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is,

an officer of the United States who is empowered by law to conduct investigations of and to make

arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

    2.    I am a Special Agent with the FBI, United States Department of Justice, and have

served in that capacity since March 2008. I was assigned to the FBI's Washington Field Office in

August 2008, where I have served on a drug and violent crime squad. I am currently the

Supervisory Special Agent assigned to the Safe Streets Task Force, which conducts investigations

relating to, among other things, narcotics violations. I have prior law enforcement experience

working for the Highland Park Department of Public Safety in Highland Park, Texas where I

served as a Public Safety Officer and Detective from 2000 to 2008. In my work with the FBI, your

affiant has received training and experience in interviewing and interrogation techniques; arrest

procedures; search and seizure; drug and money laundering investigations, including the illegal

structuring of financial transactions; surveillance techniques; asset forfeiture; possession with

intent to distribute and distribution of controlled substances; engaging in financial transactions to promote, disguise or conceal illegal drug trafficking and the source of the proceeds derived from it; unlawfully engaging in monetary transactions involving the proceeds of specified unlawful activity, practices commonly referred to collectively as "money laundering;" and conspiracies associated with the foregoing criminal offenses which are prohibited by Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, and Title 18, United States Code, Sections 922(g), 924(c), 1956 and 1957.

3.        In the course of your affiant's training and experience, your affiant has become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance, to include Title III wiretaps; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

4.        Through instruction and participation in investigations, I have become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms which traffickers use to disguise conversations about their narcotics activities. From my training and experience, I have learned, among other things, that narcotics traffickers use cellular

telephones to further their illegal activities and in many cases drug dealers will frequently "dump" or discard their phones and/or phone numbers in the belief that, by so doing, they can avoid detection and thwart the efforts of law enforcement. Cellular telephones also enable co-conspirators to remain in constant or ready communication with one another without restricting either party to a particular geographic location, thus hampering surveillance by law enforcement authorities. Finally, narcotics traffickers usually do not expressly refer to heroin or other controlled substances by name, and, when they do so, it is most often a mistake. Instead, they routinely refer to drugs and drug quantities – and also quantities of cash – by using seemingly innocuous words or phrases in an effort to conceal the true nature of their illegal activities and thwart detection by law enforcement. Narcotics traffickers also frequently have access to several cellular telephones and they periodically use newly acquired cellular telephones, or frequently change cellular telephones, to avoid detection and attempt to thwart apprehension by law enforcement. These cellular telephones are often prepaid cellular telephones which are frequently not registered or subscribed to in the purchaser's or primary user's name. Additionally, narcotics distributed in large quantities and high purity are usually "cut" or diluted prior to actual street-level distribution to the narcotics user.

5.      With respect to computers, modern-day computers can also serve as a wireless and storage device, much like a cellular telephone. For example, the computer relevant to this warrant was likely manufactured after 2010, and thus likely has wireless capabilities that make it capable to serve as an electronic medium that could back-up cellular devices, store large quantities of data, and even act as a digital repository for evidence, such as spreadsheets, ledgers, and the like, which

could uncover, among other things, evidence that reveals not only who possessed or used the device, but whether the device was used for illegal purposes. According to my review online[1], the model associated with the device's serial number is a 21.5 inch, Core i5 2.7, late 2013 model, which has 8 gigabytes of SDRAM, an integrated graphics processor with 128 megabytes of Crystalwell DRAM, and a built in Facetime HD webcam and stereo speakers. It also contains gigabit ethernet, 802. 11ac Wi_Fi, and Bluetooth capabilities. Thus, the computer may act consistent with a cellular device.

6.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search an Apple Computer, Model A1418, Silver Serial No. C02NG9K4F8J2 is associated with LINWOOD DOUGLAS THORNE ("THORNE"). Hereinafter this laptop will be referred to as "Target Device," which is currently in the possession of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and are stored at the ATF, Washington D.C. field office evidence vault located in Washington, D.C.

7.      Based on the information provided in this affidavit, I respectfully submit that probable cause exists that evidence, fruits, and instrumentalities of distribution and the possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), possessing firearms during drug trafficking crimes, in violation of 18 U.S.C. § 924(c), and unlawful possession of firearms, in violation of 18 U.S.C. § 922(g), specifically those items set forth in Attachment B, are contained within the Target Device identified in Attachment A.

---

[1] https://everymac.com/systems/apple/imac/specs/imac-core-i5-2.7-21-inch-aluminum-late-2013-specs.html

## BACKGROUND

8.      All information contained in this affidavit is either personally known to your affiant or has been related to your affiant by other law enforcement officers and/or other witnesses, or has been obtained from records and documents gathered during the course of this investigation. This affidavit contains information necessary to support probable cause for the search of the Target Device. The information contained in this affidavit is for the limited purpose of supporting the search and is not intended to include each and every fact and matter observed by or known to the affiant.

9.      Your Affiant knows that cellular telephones, laptop computers, and other electronic communication devices are tools of the drug trade. Drug traffickers communicate with customers, suppliers, and co-conspirators via cellular and laptop computers using third-party applications in order to avoid detection by law enforcement. Laptop computers are also used to create ledgers, customer contact lists, research narcotics production methods, and to store other information related to illegal narcotics trafficking.

10.      Your Affiant knows that cellular telephones used by drug traffickers contain valuable information and evidence relating to their drug trafficking. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking of drugs; (ii) identify locations where drug traffickers traveled to before and after transporting or selling narcotics; (iii) reflect the ownership and use of the cellular telephones by the drug

traffickers; (iv) document meetings and communications between drug traffickers, their customers, associates, and co-conspirators; (v) reflect communications between drug traffickers and other individuals, discussing the trafficking of narcotics; (vi) reflect communications between drug traffickers and other individuals who may have assisted or provided support in the trafficking of narcotics; (vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of narcotics relating to the trafficking of narcotics; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of narcotics.

11.     Your Affiant knows that individuals involved in drug trafficking often use cellphone cameras to take pictures of themselves as well as other members of their organization, often engaging in illegal activities such as the distribution of narcotics and the possession of firearms, as well as to take pictures of assets acquired with the proceeds of drug trafficking. These photographs can be uploaded to laptop computers and other electronic devices for storage, both on hard drives and in short term memory.

12.     Your Affiant knows that individuals involved in drug trafficking often use cellphone video recording devices to take video recordings of other members of their organization often engaging in illegal activities such as the distribution of narcotics, as well as video recordings documenting the purchase of assets with the proceeds of narcotics trafficking. These videos can be stored on mobile storage devices and laptop computers.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

13.     Based on your affiant's training and experience, your affiant uses the following

technical terms to convey the following meanings:

        a.       Computer:  A computer, sometimes called a "desktop computer" by manufacturers, is a battery- or AC-powered personal computer that can rest on a desk. The computer is often used in offices, and often contains a monitor and processor within a single unit. The unit typically contains a processor and RAM, to ensure quality speed. Some computers contain cameras, and are used with an internet connection to run Web browsers and internet applications. Modern day computers usually contain large hard drives for storage of documents, images, and other electronic media. They are also capable of using third-party applications for communication over the internet, such as "WhatsApp," "IMO," and other messaging and internet voice communication tools. Among the best-known makers of computers are IBM, Apple, Compaq, Dell, and Toshiba. Modern day computers can also interface with wireless telephone (for example, uploading storage through the Cloud).

        b.       Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing

back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

        c.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

        d.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

        e.      GPS: A Global Positioning System ("GPS") navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to

another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    14.  Based on your affiant's training, experience, and research, your affiant has reason

to believe that the Target Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or internet search device. In your affiant's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

15.     Based on your affiant's knowledge, training, and experience, your affiant knows that electronic devices, to include computers, can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

16.     Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Device was used and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Device because:

        a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

        c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about

how electronic devices were used, the purpose of their use, who used them, and when.

        d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

      17.     Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit the examination of the Target Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Target Device to human inspection in order to determine whether it contains evidence described by the warrant.

      18.     Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, your affiant submits there is reasonable cause for

the Court to authorize execution of the warrant at any time in the day or night.

## ITEMS TO BE SEARCHED

19.     This affidavit is being submitted in support of an application which seeks authorization to search the following: Apple Laptop Apple Computer, Model A1418, Silver Serial No. C02NG9K4F8J2

## PROBABLE CAUSE

### *Initial Investigation*

20.     In July 2018, agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), and the Metropolitan Police Department ("MPD") began investigating an individual ("Suspect-1") for possible criminal offenses involving the illegal sale of firearms and narcotics. As part of this investigation, an undercover special agent ("UC") engaged in two different controlled purchases with Suspect-1 between August 6 and 20, 2018. On both occasions, under surveillance, the UC exchanged several thousand dollars for several firearms and marijuana.

21.     Over the next few months, the UC engaged in additional conversations with Suspect-1. During that time, the subject of these conversations shifted from the purchase of marijuana and firearms to the purchase of heroin and firearms. Specifically, the UC inquired about purchasing 125 grams of heroin from Suspect-1. Suspect-1 explained that his supplier's heroin was completely pure, to the point that the fumes associated with the heroin would cause individuals to vomit.

***Shift to Heroin***

22.     On November 1, 2018, Suspect-1 and the UC met again so that the UC could purchase heroin and a firearm from Suspect-1. Before conducting the transaction, Suspect-1 explained that he was waiting for the heroin to arrive from his supplier. While inside the UC's vehicle, Suspect-1 sold a firearm to the UC for $700 in prerecorded funds. The UC continued to wait for the heroin, but eventually told Suspect-1 that he was going to leave. Suspect-1 stepped out of the UC's vehicle to call his heroin supplier (whom he identified as his "OG") to find out when the heroin would arrive. Suspect-1 returned to the vehicle and explained that OG was not the person dropping off the heroin, but rather that one of OG's subordinates would be doing so. After additional time spent waiting, the UC left. Within five minutes, however, Suspect-1 called the UC back. Suspect-1 apologized for the wait, but stated that the heroin had finally been delivered. The UC returned to the scene and purchased 131 grams of heroin with $10,800 in prerecorded funds.

23.     Suspect-1's telephone records revealed that, at approximately the same time Suspect-1 explained that he needed to step out of the UC's vehicle to call his heroin supplier, Suspect-1's telephone contacted telephone number (301) 383-6386. Law enforcement learned that the telephone number was a listed business contact number associated with Dou' Perfect Auto Repair and Detailing L.L.C., located at 7605 Barbara Lane, Suite B, Clinton, Maryland. The subscriber of that telephone number was listed as "Haywood Johnson" of 3101 34th Street Northeast, Washington, D.C. This address is not a real address, and law enforcement could not locate any person with that name associated with Dou' Perfect Auto Repair. Instead, a business

records search of Dou' Perfect Auto Repair revealed Linwood Douglas THORNE as a business contact.

24.     On November 29, 2018, Suspect-1 and the UC met again to conduct another transaction similar to the one conducted on November 1. The two agreed to meet in the parking lot of 1535 Alabama Avenue Southeast, Washington, D.C. sometime after 2:00 p.m. Suspect-1 explained to the UC that, before meeting the UC, Suspect-1's driver would be picking him up and taking him to meet his heroin supplier to obtain the heroin.

25.     Law enforcement surveilled both Suspect-1 and Dou' Perfect Auto Repair. At approximately 2:00 p.m., law enforcement observed Suspect-1 pull into the parking lot of the Hip Hop Fish and Chicken restaurant located at 7600 Old Branch Avenue, Clinton, MD. Suspect-1 entered the restaurant. Simultaneously, law enforcement observed THORNE leave Dou' Perfect Auto Repair and drive approximately three minutes to Hip Hop Fish and Chicken. THORNE exited his vehicle, entered the restaurant, and met with Suspect-1. Within a few minutes, THORNE and Suspect-1 exited the restaurant. Both individuals got into their respective vehicles and drove to Mid-Atlantic Crab & Seafood located directly across the street. THORNE and Suspect-1 briefly interacted. THORNE then returned back to Dou' Perfect Auto Repair. Suspect-1 got into his vehicle and left.

26.     Suspect-1 drove directly to the parking lot located at 1535 Alabama Avenue Southeast. Once there, Suspect-1 sold the UC three firearms and 129 grams of heroin—batched in large chunks—for $10,300 in prerecorded funds.

14

### Search Warrants

27.     Using various records checks between November 29, 2018 and December 17, 2018, law enforcement determined that THORNE resided at 4215 Foote Street Northeast, Washington, D.C. Law enforcement confirmed this fact upon observing THORNE leaving 4215 Foote Street Northeast on several occasions, including on December 7 and 11, 2018.

28.     On December 19, 2018, law enforcement agents simultaneously executed multiple search warrants related to this case, including at THORNE's residence at 4215 Foote Street Northeast, and at Dou' Perfect Auto Repair. At Dou' Perfect Auto Repair, law enforcement recovered 9mm ammunition and mail matter. At THORNE's residence, law enforcement recovered approximately 44 kilograms of heroin laced with fentanyl, 55 pounds of marijuana, a drug press, and six firearms. The majority of the heroin was located in tool chests and footlockers found in the main bedroom and living room. The firearms were located in the main bedroom. The drug press was found in the kitchen. Law enforcement also recovered items containing THORNE's name inside of the home. The value of the heroin alone was over four million dollars. THORNE lived at the residence with an individual, Witness-1. Witness-1 identified the containers in which the heroin and marijuana was stored as having had belonged to Thorne.

### Apprehension

29.     After the search warrants were executed, on December 20, 2018, a grand jury indicted THORNE on one count of Possessing with Intent to Distribute More than One Kilogram of Heroin (in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii)) and one count of Using, Carrying, or Possessing a Firearm during a Drug Trafficking Offense (in violation of 18 U.S.C. §

924(c).[2] On the same date, the Honorable U.S. Magistrate Judge Robin M. Meriweather issued an arrest warrant for THORNE's arrest, which the Court placed under seal. The same day, an attorney claiming to represent THORNE called to arrange THORNE's surrender the following day—Friday, December 21. The attorney stated that THORNE wanted to surrender in Baltimore, Maryland. Thus, on December 21, agents were prepared to arrest THORNE when the same attorney contacted law enforcement and explained that THORNE now wanted to turn himself in the following Wednesday, December 26, so that he could spend time with his family over the holiday. The agent who spoke to the attorney explained that he appreciated THORNE's concerns, but that law enforcement intended to apprehend THORNE as quickly and safely as possible. THORNE did not surrender on December 21, 2018.

30.     The following day—December 22, 2018—the same agent who previously spoke to the first attorney received a telephone call from a second attorney claiming to represent THORNE. This attorney explained that THORNE wished to spend the holiday with his family. From December 22 to 25, law enforcement was unable to locate or apprehend THORNE. On December 25, law enforcement contacted the second attorney, asking whether THORNE would in fact turn himself in the following day as originally discussed. The attorney explained THORNE did not intend to turn himself in the following day. Law enforcement thus continued to search for THORNE to no avail.

31.     On January 3, 2019—long after THORNE claimed he would self-surrender—law

---

[2] The case is docketed as 18-cr-389 (BAH) and the grand jury has returned a superseding indictment related to additional narcotics charges.

16

enforcement tracked THORNE to 2226 Linden Avenue, Baltimore, Maryland. THORNE was alone in the apartment and was apprehended without resistance. THORNE was the only person in the apartment (although agents had observed two persons leave from the apartment previously). In addition to finding THORNE, agents seized four cell phones within the apartment.

### *Additional Context*

32.     On January 18, 2019, law enforcement sought judicial authorization to search all four phones. The warrant was subsequently signed and authorized by U.S. Magistrate Judge Deborah Robinson (19-sw-19). Soon thereafter, law enforcement attempted to download the contents of all four devices pursuant to warrant. Of those four phones, only a single Apple iPhone resulted in a successful extraction initially.

33.     Upon review of the Apple iPhone's contents, law enforcement learned that the Apple iPhone belonged to an individual named James Hutchings, a person who was stopped outside of the apartment where THORNE was apprehended, minutes before THORNE's apprehension. On the cell phone, law enforcement learned that Hutchings had purchased some of the firearms recovered in THORNE's residence, and helped traffic the firearms from the state of Georgia to the District of Columbia to provide to THORNE. Both THORNE and Hutchings are convicted felons, and are thus unable to lawfully possess firearms. On October 7, 2020, after learning that law enforcement could have obtained additional de-encryption capability over the past year, law enforcement applied for authorization to re-search the three remaining phones. Upon cracking the phones, law enforcement obtained additional evidence relevant to Thorne, Hutchings, and the crimes at issue.

*New Developments*

34.     On February 4, 2022, in preparation for a jury trial scheduled on March 14, 2022, law enforcement met with Witness-1. The purpose of the meeting was to discuss Witness-1's possible jury testimony, as well as go over trial logistics and security concerns. During the meeting, Witness-1 mentioned – for the first time – that after THORNE's arrest, he had asked Witness-1 to help retrieve and transfer some of his personal items to a storage unit that belonged to Witness-1. Some of those items included not only personal apparel or legal paperwork, but multiple digital devices. Witness-1 noted that other persons also had access to the storage unit. The storage unit was located on Kenilworth Avenue, N.E., Washington, D.C.

35.     On Monday, February 7, 2022, FBI and ATF agents arrived at the storage unit, located on Kenilworth Avenue N.E., and with Witness-1's consent, entered the storage unit. After a search of the unit, they seized the Target Device, which Witness-1 identified as belonging to THORNE. According to Witness-1, the Target Device had remained at the same storage facility since approximately Spring of 2019. ATF seized the Target Device, and transferred it to the ATF Washington Field Division, located in the District of Columbia, where it remains in storage as evidence. Law enforcement now seeks judicial authority to search the Target Device.

## CONCLUSION

36.     Based on your affiant's training and experience, your affiant believes a search of the Target Device may reveal evidence pertaining to THORNE's alleged violations of federal narcotics and firearms laws. Moreover, a search of the Target Device could further reveal ownership of it, and whether additional persons are involved in such crimes, other than THORNE.

Your affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Devices as described in Attachment A to seek the items described in Attachment B.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Christopher Ray
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 7, 2022.

_____
The Honorable Robin M. Meriweather
United States Magistrate Judge

19